# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8640 | **DATE** | 5/15/2003 |
| **CASE TITLE** | Repository Technologies vs. Systems Consultants, Inc., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: GEMS' and Cass' motion to dismiss for improper venue (10-1) is denied. In the alternative, we grant GEMS' and Cass' motion to transfer (10-2) this action to the United States District Court for the Eastern District of Missouri. Consequently, we deny defendants' motion to dismiss for lack of personal jurisdiction (14-1) and GEMS' and Cass' motion to dismiss or failure to state a claim (15-1) as moot. The Clerk of the Court is directed to transfer the above cause of action to the United States District Court for the Eastern District of Missouri.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | MAY 16 2003 | |
| ✓ | Notices mailed by judge's staff. | | date docketed | 32 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | ED-7 FILED FOR DOCKETING | 5/15/2003 date mailed notice | |
| GL | courtroom deputy's initials | 03 MAY 15 PM 2:23 | GL mailing deputy initials | |
| | | Date/time received in central Clerk's Office U.S. DISTRICT COURT | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| REPOSITORY TECHNOLOGIES, a Delaware corporation, ) ) ) | |
| Plaintiff, ) ) ) | |
| v. ) | Case No. 02-C-8640 |
| ) SYSTEMS CONSULTANTS, INC. n/k/a ) HUNTER TECHNOLOGY, INC., a Missouri, ) corporation, GOVERNMENT E-MANAGEMENT ) SOLUTIONS, INC. f/k/a/ GOVERNMENT ) E-BUSINESS, INC., a Missouri corporation, ) CASS COMMERCIAL BANK, a Missouri ) corporation, and JOHN A. SHARP, a Missouri ) citizen, ) ) ) Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

On November 27, 2002, Plaintiff, Repository Technologies, Inc. ("RTI"), filed a five-count complaint against Defendants, Systems Consultants, Inc. ("SCI"), Government E-Management Solutions, Inc. ("GEMS"), Cass Commercial Bank ("Cass"), and John A. Sharp ("Sharp") (collectively "Defendants"). Plaintiff seeks to enforce against Defendants the judgment it obtained against SCI for money owed pursuant to a Software Licensing Agreement between RTI and SCI (Count II), and to pierce the corporate veil of all Defendants (Count V). Plaintiff also claims that Defendants violated the Uniform Fraudulent Transfer Act ("UFTA"), 740 ILCS 160/5(a)(1), 6(a) (Count I). Plaintiff further alleges that Defendants GEMS, Cass, and Sharp intentionally interfered with RTI's contract with SCI (Count III), and tortiously interfered with RTI's prospective economic advantage (Count IV). Presently before us is the motion of Defendants to dismiss Plaintiff's complaint for lack of personal jurisdiction

under Federal Rule of Civil Procedure ("FRCP") 12(b)(2). Also before us are the motions of Defendants GEMS and Cass to dismiss the complaint for improper venue pursuant to FRCP 12(b)(3), for failure to state a claim upon which relief can be granted under FRCP 12(b)(6), and, in the alternative, to transfer venue to the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. §1406. For the reasons stated below, we deny GEMS' and Cass' motion to dismiss for improper venue, but grant their motion to transfer venue to the United States District Court for the Eastern District of Missouri. We deny as moot Defendants' motions to dismiss for lack of personal jurisdiction and GEMS' and Cass' motion to dismiss for failure to state a claim upon which relief may be granted.

I. BACKGROUND[1]

### A. Identity of the Parties

Plaintiff RTI is a Delaware corporation with its principal place of business at 1001 Warrenville Road, Suite 104, Lisle, Illinois. RTI is in the business of developing and selling its CustomerFirst, WebFirst, SalesFirst, TechSearch, and Inventory Management software products. Defendant SCI is a Missouri corporation with its principal place of business at 7350 Cornell Avenue, St. Louis, Missouri. Prior to January 2, 2001, SCI's principle place of business was located at 121 Hunter Avenue, St. Louis, Missouri, and SCI was in the business of providing enterprise application software and software consulting services to customers in the public sector. As of January 2, 2001, SCI effectively ceased ongoing business operations, but remains a Missouri corporation, having changed its name to Hunter Technology.

Defendant GEMS, formerly known as Government e-Business, Inc., is a Missouri corporation with its principal place of business at 121 Hunter Avenue, St. Louis, Missouri, the former location of SCI. GEMS is in the business of providing enterprise application software and software consulting

---

[1]The facts contained herein are adopted from Plaintiff's complaint.

services identical to those provided by SCI prior to January 2, 2001 to customers in the public sector. GEMS is either a wholly-owned subsidiary of Cass or of Cass Information Systems, Inc. ("CIS"). Defendant Cass is a Missouri corporation with its principle place of business at 13001 Hollenberg Drive, Bridgeton, Missouri. Cass is in the business of providing banking services to privately-held businesses in the St. Louis metropolitan area, as well as to churches and ministries throughout the country. Cass is a wholly-owned subsidiary of CIS. Defendant Sharp is a Missouri citizen who resides at 7350 Cornell Avenue, St. Louis, Missouri. Sharp was, at all times relevant to Plaintiff's complaint, the majority shareholder of SCI.

**B.    Facts**

On February 16, 2001, RTI filed a one count breach of contract suit against SCI in the United States District Court for the Northern District of Illinois, Case No. 01-C-1103, to recover contractually mandated fees due from SCI to RTI for the licensing of software and the provision of services pursuant to a written agreement between RTI and SCI. On April 16, 2001, the Honorable Elaine E. Bucklo entered judgment in favor of RTI and against SCI, awarding RTI $178,694.89 plus costs and post-judgment interest. On or about June 14, 2001, RTI registered the judgment in the State of Missouri and filed a supplemental proceeding in the United States District Court for the Eastern District of Missouri, Eastern Division, Case No. 4:01MC00173 CEJ ("Supplemental Proceeding"), seeking to satisfy the judgment. To date, RTI is still the owner and holder of the judgment, no portion of which has been paid.

RTI's inability to satisfy the judgment stems from a series of events that followed SCI's default on a loan made by Cass. On or about December 6, 1999, SCI and Cass executed a promissory note ("Note") in favor of Cass for $3,500,000.00. Cass secured repayment of the Note through a Commercial Security Agreement. Sharp and his wife, Victoria Sharp, were, at all relevant times, personal guarantors of the Note. Prior to September 21, 2000, SCI defaulted on the Note. On or about September 21, 2000,

Cass entered into a Standstill and Forbearance Agreement ("Standstill Agreement") with SCI and the Sharps. In the Standstill Agreement, SCI acknowledged that it was in default under the terms of the Note. Sharp agreed to a list of thirty-five actions that effectively transferred to Cass the power to operate SCI.[2] In turn, Cass agreed to forebear collection of the Note until October 9, 2000.

The Standstill Agreement was modified on or about October 3, 2000 to extend Cass' forbearance until November 30, 2000. Pursuant to the modification, Sharp agreed to cooperate with Cass in the transition that followed the sale of SCI assets or shares of stock. Specifically, Sharp agreed to join the purchaser of SCI stock or assets under an employment contract as a full-time CEO for a period of up to two years or as a consultant for up to one year. Cass extended the forbearance once more on or about November 30, 2000. At that time, Cass developed a scheme to transport business from SCI to GEMS through a sham foreclosure sale to benefit GEMS, Cass, and Sharp at the expense of SCI's creditors, including RTI.

As part of Defendants' plan, on or about December 21, 2000, GEMS and Sharp entered into an Employment Agreement detailing the intent of GEMS, Cass, and Sharp to transfer SCI's customer contracts, revenue, web site, and goodwill to GEMS without any consideration being paid to SCI, leaving it a shell corporation. Sharp was thereafter entitled to the following bonuses based on revenues received by GEMS from SCI's customers:

> [a] bonus of $20,000 in the event [GEMS] receives cash collected revenues over $1,200,000 during the period January 1, 2001 to March 31, 2001 and [GEMS] retains

---

[2]Sharp agreed, *inter alia*, that he would do the following: use his best efforts to sell SCI; turn over SCI's monetary receipts to Cass and direct SCI's customers to make payments to a Cass Lock Box; use his best efforts to maintain SCI's accounts receivable; provide weekly CEO, COO, and CFO approved, updated cash flow projections to Cass; give Cass a detailed budget; use only standard form contracts approved by Cass; not make any principal payments on SCI's debts without Cass' approval; provide Cass with a list of all companies in competition with SCI; authorize Cass' agent to review SCI's accounts receivables, projections and records, including reasonable access to SCI's financial records; and meet with Cass representatives on a weekly basis.

substantially all current customers, but, in any event, customers with 200 hours of undelivered software services and all business from such customers during this period. Such bonus shall be paid on or before May 15, 2001. §4(f)(i).

The Agreement also sets forth that Sharp will receive a 24% ownership interest in GEMS if GEMS sells SCI's business before December 31, 2003.[3] SCI will not receive any value for its customer contracts, goodwill, name, website, or the generated proceeds and profits in exchange for Sharp's receipt of his ownership interest.

On January 2, 2001, SCI, Cass, GEMS and Sharp staged a purported foreclosure sale at 121 Hunter Avenue, St. Louis, Missouri, SCI's then-headquarters and GEMS' current headquarters, to pay off the Note. At the sale, GEMS, acting either as a wholly-owned subsidiary of Cass or of CIS, was the lone bidder, acquiring the right, title, or interest in any contracts between SCI and its customers for $3,700,000.00.[4] SCI, through Sharp, gratuitously transferred most, if not all of its customer contracts to GEMS. Cass never reduced the balance due on the Note to reflect GEMS' purchase and payment. Cass has not taken action against Sharp and his wife to collect the amount due on the Note.

On the same day as the foreclosure sale, GEMS' Executive Vice President, William C. Bouchein ("Bouchein") sent form letters to all known SCI creditors stating that GEMS purchased certain SCI assets at a foreclosure sale and that "[GEMS] does not accept any responsibility for the payment of

---

[3]If GEMS sells the business before December 31, 2003, the monies are to be distributed to Cass to satisfy any existing loan amount owed by SCI, and then to Cass and Sharp on a 76%/24% split. If GEMS does not sell SCI's business before December 31, 2003, Sharp's interest in GEMS is cashed out at a 24% hypothetical sale price established in the Employment Agreement less the loan amount SCI owes to Cass.

[4]Under the Employment Agreement, Cass is entitled to $3,165,000.00, the difference between the existing loan amount owed by SCI, $4,490,000.00, Cass' estimate of SCI's value on the date of the Agreement, $1,325,000.00. Cass' estimate represents the difference between SCI's assets, estimated at $2,685,000.00 and certain SCI liabilities, estimated at $1,360,000.00. Cass' estimate did not take into account any potential purchaser's bid at a future foreclosure sale. Cass' account also did not factor in the value of SCI customer contracts, the SCI name, SCI goodwill, or the SCI web site.

5

[creditor's] outstanding balance." GEMS sent this letter to at least forty-six creditors across the country, including RTI. Bouchein did not inform creditors of GEMS' relationship to Cass, instead referring to Cass as "a lender, a secured party." Bouchein also did not inform SCI's creditors that GEMS and Cass promised Sharp bonuses based on GEMS revenues received from SCI customers as well as a 24% ownership interest in GEMS prior to the foreclosure sale.

Following the foreclosure sale, GEMS claimed to be doing business as SCI, assuming the obligations of SCI customer contracts and using SCI's name in contracts and promotional materials. Sharp sent a letter to SCI's customers informing them that "SCI has become a wholly-owned subsidiary of Cass Information Systems (CIS) as of January 2, 2001." GEMS also amended SCI's contracts with SCI's customers in which GEMS advised those customers "[t]hat as of January 2, 2001, GEMS has assumed all obligations and duties under the [date of] Agreement and shall have all rights and benefits under the Agreement previously inuring to SCI." For months after the foreclosure, GEMS used SCI's web site without revealing GEMS' identity. The web site, located at www.sci-gateway.com, now states that GEMS purchased "certain assets" of SCI in January 2001.

In May 2001, GEMS, using stationary with the logo "SCI Government e-Management Solutions, Inc.," solicited the City of Gainsville, Georgia to enter into an addendum to the City's contract with SCI. GEMS referred to itself as SCI in the letter and attachments. Furthermore, the addendum to the SCI contract proposed by GEMS recites that the parties to the contract are the City of Gainsville and "Government e-Management Solutions, Inc. doing business as Systems Consultants, Inc." One year after the foreclosure sale, GEMS was servicing at least fifty-eight SCI customer contracts. Several of those contracts were and are located in Illinois, including the City of Berwyn, the City of Champaign, the City of Rolling Meadows, the Village of Downers Grove, the Village of Mount Prospect, and the Village of Northbrook. Plaintiff brought a five-count complaint against Defendants on November 27, 2002.

Defendants subsequently filed their motions to dismiss based on lack of personal jurisdiction. Defendants GEMS and Cass also filed their motions to dismiss for improper venue, for failure to state a claim or, in the alternative, to transfer the action.

## II. ANALYSIS

Although all Defendants have moved to dismiss the complaint for lack of personal jurisdiction under FRCP 12(b)(2), we deem it prudent to first address the issue of venue. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 180, 99 S.Ct. 2710, 2715, 61 L.Ed.2d 464 (1987) ("when there is sound prudential justification for doing so," a court may consider venue before jurisdiction). With respect to venue, Defendants GEMS and Cass have moved to dismiss the complaint for improper venue under FRCP 12(b)(3) or, in the alternative, to transfer venue to the United States District Court for the Eastern District of Missouri under 28 U.S.C. §1406. In resolving a motion to dismiss for lack of proper venue, the plaintiff bears the burden of establishing that venue is proper. *See, e.g., Emjayco v. Morgan Stanley & Co., Inc.*, 901 F.Supp. 1397, 1400 (C.D.Ill. 1995). We must resolve any factual conflicts in the parties' submissions in favor of the plaintiff and draw any reasonable inferences from those facts in the plaintiff's favor. *See, e.g., Nagel v. ADM Investor Services, Inc.*, 995 F.Supp. 837, 843 (N.D.Ill. 1998). With these standards in mind, we turn to GEMS' and Cass' motion.

GEMS and Cass argue that the Northern District of Illinois is an improper venue for Plaintiff's complaint. We agree. Venue in a diversity action, such as the case presently before us, is governed by 28 U.S.C. §1391(a), which declares that an action may only be brought in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same state,
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated, or

(3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

Plaintiff RTI asserts that its complaint is properly before the Northern District of Illinois because it is where a "substantial part of the events or omissions giving rise" to its claims occurred. §1391(a)(2). Each count of Plaintiff's complaint is premised on what it describes as Defendants' scheme to defraud SCI's creditors, including RTI. The overwhelming part of this alleged scheme took place in the State of Missouri. SCI, a Missouri corporation with its principal place of business in St. Louis County, Missouri, defaulted on the loan from Cass, also a Missouri corporation with its principal place of business in St. Louis County, Missouri, in Missouri. Sharp, a citizen and resident of Missouri, and Cass executed the Standstill Agreement and modifications thereto in Missouri. Sharp entered into the Employment Agreement with GEMS, a Missouri corporation with its principal place of business in St. Louis County, Missouri, in Missouri. The purported transfer of SCI's customer contracts to GEMS occurred in Missouri.[5] GEMS' purchase of certain SCI's assets occurred at a foreclosure sale which took place in Missouri.

RTI nonetheless points to four events which it contends constitute a substantial part of the events giving rise to its claims. First, RTI emphasizes that it's injury – the inability to collect the judgment it secured against SCI – occurred in Lisle, Illinois, which is located in the Northern District of Illinois.

---

[5] In its submissions to this Court regarding the issue of personal jurisdiction, RTI asserts that the Standstill Agreement and modifications thereto, the Employment Agreement, and the transfer of SCI's Illinois customer contracts to GEMS all occurred in Illinois. We disagree. Both agreements were executed in Missouri by Missouri corporations and a Missouri citizen and pertained to the obligations the Missouri parties had with respect to one another. Similarly, the transfer of SCI's contracts allegedly took place between two Missouri corporations in Missouri, not Illinois. Although RTI may be correct that the Illinois contracts are governed by Illinois law, they fail to identify any law in support of their contention that when an out-of-state transfer of Illinois-based contracts occurs from one non-resident defendant to another non-resident defendant, Illinois courts consider the transfer to have occurred in Illinois.

8

Section 1391(a)(2), however, focuses on the location of the events which give rise to a party's injury, not the location of the injury itself. Second, RTI argues that its claims "lie in the wake" of Defendants' transaction of business with five SCI customers located in the Northern District of Illinois.[6] Third, RTI points out that the letter GEMS' Executive Vice President Bouchein sent to SCI's creditors, including RTI, informing them that GEMS purchased certain SCI assets at a foreclosure sale and that "[GEMS] does not accept any responsibility for the payment of [creditor's] outstanding balance" gave rise to RTI's claims. Finally, RTI contends that its claims arise from Defendants' acquisition of an ownership interest in revenues generated from SCI's five customer contracts in the Northern District of Illinois.[7] While these last three events do give rise to RTI's claims, they do not form a substantial part of the events that underlie RTI's complaint. To the contrary, the Defendants' alleged scheme to defraud creditors was hatched and carried out, in large part, in Missouri. As a consequence, we find venue to be improper under §1391(a)(2).

RTI alternatively asserts that its complaint is properly before the Northern District of Illinois pursuant to §1391(a)(1) because all of the corporate Defendants reside in Illinois. For the purposes of determining the propriety of venue, "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."

---

[6]Plaintiff does not identify which Defendants are currently transacting business with SCI's five clients in the Northern District of Illinois. In examining the submissions of the parties, it is clear that Defendant GEMS is transacting business in this jurisdiction. According to RTI's complaint, SCI "*was* in the business of providing enterprise application software and software consulting services to customers in the public sector. As of January 2, 2001, SCI *effectively ceased ongoing business operations.*" Compl. at ¶8 (emphasis added). RTI does not allege that either Sharp, in his individual capacity, or Cass is transacting business with SCI's customers in Illinois.

[7]Again, Plaintiff does not identify which Defendants obtained an ownership interest in the revenues generated by SCI's customer contracts in the Northern District of Illinois. GEMS arguably obtained such an interest at the time of the transfer of SCI's customer contracts from SCI to GEMS. Under the Employment Agreement with GEMS, Sharp is entitled to a 24% interest in the value of GEMS on or before December 31, 2003. Sharp has therefore not yet acquired his ownership interest.

9

§1391(c). Unlike the corporate Defendants, Sharp is, of course, an individual, who resides in Missouri. To accept RTI's alternate basis for jurisdiction, this Court would have to find personal jurisdiction lacking over Sharp, dismiss Sharp from the litigation, and find that the corporate Defendants are subject to personal jurisdiction in the Northern District of Illinois. Even if we were to dismiss Sharp, however, we could not conclude that all corporate Defendants are subject to personal jurisdiction in this judicial district. Indeed, at the very least, we would not be able to exercise personal jurisdiction over SCI.

As the plaintiff, RTI has the burden to establish a prima facie case for personal jurisdiction. *See RAR, Inc. v. Turner Diesel, Ltd.* 107 F.3d 1272, 1276 (7th Cir. 1997). A federal district court may exercise personal jurisdiction "only if the state in which it sits would have such jurisdiction." *Klump v. Duffus*, 71 F.3d 1368, 1371 (7th Cir. 1995). As a federal district court sitting in Illinois, we may exercise personal jurisdiction over Defendants if: (1) Illinois law grants such jurisdiction; (2) the exercise of personal jurisdiction would not violate Illinois constitutional due process requirements; and (3) the exercise of personal jurisdiction would not violate federal constitutional due process requirements. *See Cent. States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939 (7th Cir. 2000). Although the Illinois long arm statute provides a list of specific actions that will authorize the jurisdiction of Illinois courts, it also permits courts in Illinois to exercise personal jurisdiction to the maximum extent allowed by the Illinois and federal constitutions. *See* 735 ILCS 5/2-209(a), (c). The three inquiries listed above may therefore be reduced to an analysis of whether the exercise of personal jurisdiction over Defendants would violate federal due process requirements. *See Klump*, 71 F.3d at 1371.

In order to subject a non-resident defendant to personal jurisdiction "due process requires [that] he have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S.

10

310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (internal quotation omitted). To establish such minimum contacts, a defendant must "purposefully avail[ ] itself of the privilege of conducting activities within the forum State, thus invoking the protections and benefits of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed. 1283 (1958). As a consequence, the defendant "should reasonably anticipate being haled into court" in the forum State. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (internal citations omitted).

This Court's assessment of minimum contacts turns on whether general or specific jurisdiction is at issue. *See RAR*, 107 F.3d at 1277. General jurisdiction is proper if the defendant has "continuous and systematic general business contacts" with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984). Factors we may examine in determining whether general jurisdiction exist include: (1) the extent to which the defendant conducts business in Illinois; (2) whether the defendant maintains an office or employees in Illinois; (3) whether the defendant sends agents into Illinois to conduct business; (4) whether the defendant advertises or solicits business in Illinois; and (5) whether the defendant has designated an agent for service of process in Illinois. *See id.* 466 U.S. at 416, 104 S.Ct. at 1873. In contrast, specific jurisdiction is proper over a non-resident defendant when the claim arises from or is related to the defendant's contacts with the forum. *See id.* 466 U.S. at 414 n. 8, 104 S.Ct. at 1872 n. 8.

Plaintiff contends that we may exercise either general or specific personal jurisdiction over SCI.[8] We disagree. For the exercise of general jurisdiction to be proper, Illinois courts insist that a defendant's

---

[8] RTI first set forth this basis for jurisdiction in its Response to SCI's Motion to Dismiss. SCI argues that we may not consider RTI's claim because it failed to identify such a ground jurisdiction in its complaint. Although FRCP 8(a)(1) states that a complaint must identify the basis of jurisdiction, we may sustain jurisdiction if allegations in the complaint reveal a proper basis for jurisdiction. *See Jensen v. State Bd. of Tax Comm'rs of State of Indiana*, 763 F.2d 272, 278 (7th Cir. 1985). We will therefore consider RTI's claim for general jurisdiction.

11

continuous and systematic business contacts "continue up to the time of suit." *Asset Allocation & Management Co. v. W. Employers Ins. Co.*, 892 F.2d 566, 570 (7th Cir. 1989). RTI filed its complaint on November 27, 2002. The complaint states that "SCI *was* in the business of providing enterprise application software and software consulting services to customers in the public sector. As of January 2, 2001, SCI *effectively ceased ongoing business operations*." Compl. at ¶8 (emphasis added). SCI's business operations did not continue up to the time of suit, but instead effectively ceased almost two years before RTI filed its complaint.[9]

Prior to January 2, 2001, SCI entered into contracts with six Illinois customers. RTI maintains that SCI has had continued and systematic general business contacts with Illinois since January 2, 2001 in order to perform its obligations and duties under those contracts with its Illinois customers. RTI points to Sharp's letter to SCI's customers informing them that "SCI has become a wholly-owned subsidiary of Cass Information Systems (CIS) as of January 2, 2001." According, to RTI's complaint, however, GEMS "entered into amendments to SCI's contracts with SCI's customers" in which GEMS stated "as of January 2, 2001, GEMS has assumed all [of SCI's] obligations and duties" as well as all of SCI's "rights and benefits" under those contracts. Compl. at ¶26. As the complaint further explains, GEMS "claimed to be doing business as SCI," converting SCI to "a shell corporation." Compl. at ¶¶26, 19. In light of the allegations in RTI's complaint, we would not be able to exercise general jurisdiction over SCI.

RTI posits that this Court could nonetheless exercise specific jurisdiction over SCI because RTI's claims arise from SCI's specific contacts with Illinois. Again, we disagree. RTI first argues that its claims arise from SCI's transaction of business within Illinois. *See* 735 ILCS 5/2-209(a)(1). At a

---

[9]SCI, through Sharp, avers that SCI has never maintained an office or other place of business in Illinois, has never registered to do business in Illinois, has no registered office or telephone listing in Illinois, and has no designated agent upon whom service of process can be made in Illinois.

minimum, RTI's claims must lie "in the wake" of SCI's commercial activities in Illinois. *Gaidar v. Tippecanoe Distribution Service, Inc.*, 702 N.E.2d 316, 323 (Ill. App. Ct. 1998). Prior to January 2, 2001, SCI had five clients in the Northern District with which it had entered into contracts over a period of time from 1988 to 2000. The contracts, which GEMS have since assumed, provide for the delivery and support of hardware and software in Illinois coupled with training and ongoing maintenance agreements. RTI's claims alleging a violation of the Uniform Transfer Act (Count I), seeking to enforce the judgment RTI obtained against SCI (Count II), and seeking to pierce the corporate veil (Count V) do not lie in the wake of SCI's commercial activities in Illinois. Instead, RTI's claims arise from the scheme Defendants allegedly hatched to sell some of SCI's assets at a sham foreclosure sale while SCI gratuitously transferred its customer contracts, name, web site, goodwill, and personnel to GEMS with an intent to delay, or defraud creditors of SCI while GEMS did business as a mere continuation of SCI.

RTI secondly asserts that its claims arise from SCI's "commission of a tortious act" in the State of Illinois. 735 ILCS 5/2-209(a)(2). To allege jurisdiction based on SCI's tortious acts, RTI:

> must allege that the defendant performed an act or omission which caused an injury in Illinois and that the act or omission was tortious in nature. Alternatively, the . . . plaintiff [must] demonstrate[ ] an economic injury in Illinois coupled with activity [in Illinois] indicating an intent to affect Illinois residents.

*Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 282 (7th Cir. 1990); *see also Club Ass't Program, Inc. v. Zukerman*, 594 F.Supp. 341, 346 (C.D.Ill. 1984) (explaining that the activity indicating an intent to affect Illinois residents must occur in Illinois).

RTI contends that the transfer of SCI's contracts located in the Northern District of Illinois to GEMS occurred in Illinois. In contrast, SCI, through Sharp, avers that SCI did not engage in any acts underlying RTI's claims in Illinois. RTI has failed to counter Sharp's affidavit by demonstrating that the transfer of the contracts at issue did occur in Illinois. Indeed, the cases to which RTI cites in support of

its contention are unavailing. In *Fresco v. Haden Uniking Corporation*, 1990 WL 304198 (N.D.Ill. 1990) the court held that a contract for products and services to be delivered and installed in Illinois are governed by Illinois law. In *United States Borax & Chemical Corporation v. Carpentier*, 150 N.E.2d 818 (Ill. 1958), the Illinois Supreme Court found that Illinois is the site where revenues are generated from transacting business in Illinois. The holdings in *Fresco* and *Carpentier* do not suggest that SCI's transfer of its Northern District of Illinois customer contracts to GEMS occurred in Illinois rather than in Missouri. Thus, we would not be able to exercise jurisdiction over SCI based on the transfer those contracts.

RTI also contends that the letter SCI sent, though Sharp, to its Northern District of Illinois customers informing them that "SCI has become a wholly-owned subsidiary of Cass Information Systems (CIS) as of January 2, 2001" constitutes a tortious act that took place in Illinois. Courts in this jurisdiction have held that tortious mailings from a non-resident defendant to Illinois residents that affect interests in Illinois are sufficient to confer jurisdiction over the non-resident defendant. *See Cross v. Simons*, 729 F.Supp. 588, 592 (N.D.Ill. 1989); *see also McClub Services, Inc. v. Stovall*, 714 F.Supp. 370, 373 (N.D.Ill. 1989). In *McClub*, the non-resident defendant moved to dismiss for lack of personal jurisdiction arguing that its only contact with Illinois was a few telephone calls and mailings to the Illinois plaintiff. 714 F.Supp. at 371. The *McClub* court denied the motion, finding that plaintiffs successfully alleged that the tortious conduct consisted of mailing fraudulent statements into Illinois where the defendant intended, and indeed caused, an economic injury to an Illinois resident. *See id.*

In this case, RTI posits that SCI sent the letter to its Illinois customers "to further convince SCI's customers that SCI and GEMS were one and the same." Compl. ¶27. RTI contends that the letter demonstrates SCI's intent to affect the interests of its Illinois creditors, including RTI. *See* Pl. Resp. at 10-11. RTI fails to demonstrate that the mailing constituted a tort which was intended to and did cause

14

injury to an Illinois resident. While this Court acknowledges that RTI's inability to collect the judgment it secured against SCI constitutes an economic injury, it has failed to demonstrate that its injury stemmed from SCI's letter to its Illinois customers. In contrast, Bouchein, GEMS' Executive Vice President, sent a letter directly to RTI and other Illinois creditors of SCI stating that GEMS purchased certain SCI assets at a foreclosure sale and that "[GEMS] does not accept any responsibility for the payment of [creditor's] outstanding balance." RTI has shown that GEMS intended this letter to cause economic injury and did cause economic injury to RTI, an Illinois resident. However, we would not be able to exercise specific jurisdiction over SCI based on a letter that GEMS sent to RTI.

RTI finally argues that its claims arise from SCI's making of contracts "substantially connected with" Illinois. 735 ILCS 5/2-209(a)(7). RTI does not specify which contracts subject SCI to the jurisdiction of this Court. We interpret RTI's reference to SCI's making of contracts to pertain to the Standstill Agreement and the Modification of the Standstill Agreement.[10] To determine whether those contracts are substantially connected with the State of Illinois, we must examine each contract as a whole. *See Goldberg v. Miller*, 874 F.Supp. 874, 878 (N.D.Ill. 1995). According to RTI, the Standstill Agreement set forth Cass' agreement to forbear on the collection of the Note in exchange for Sharp's performance of certain actions that would effectively transfer the power to operate SCI to Cass. The Modification of the Standstill Agreement further delayed Cass' forbearance on the collection of the Note in exchange for Sharp's cooperation with Cass in the transition following the sale of SCI's assets or shares of stock. The corporate parties to each contract, SCI and Cass, are Missouri corporations with their principal places of business in Missouri. Sharp, the individual party to each contract, is a citizen and resident of Missouri. SCI avers, through Sharp, that it did not perform any acts under either contract

---

[10] RTI has the burden to identify which contracts subject SCI to the jurisdiction of this Court. If RTI was referring to SCI's contracts with its Illinois clients, it has failed to demonstrate how its claim arose from the making or performance of those contracts.

in Illinois. Thus, this Court lacks jurisdiction under Section 2-209(a)(7) of the Illinois long-arm statute. Because we have neither specific nor general jurisdiction over SCI, we cannot exercise jurisdiction over it in a manner consistent with protections affording by the Illinois and federal constitutions. Because all corporate Defendants subject to RTI's complaint do not reside in the Northern District of Illinois, venue is improper under 28 U.S.C. §1391(a)(1).

RTI has failed to establish that venue is proper under §1391(a). Although we may dismiss the complaint on the basis of improper venue, we choose to exercise our discretion under 28 U.S.C. §1406(a) and transfer the case to the United States District Court for the Eastern District of Missouri. Section 1406(a) states that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Clearly, this action could have been filed in the Eastern District of Missouri, since all Defendants reside there for the purposes of venue under 28 U.S.C. §1391(a). We therefore find that the interest of justice and the interest of judicial economy will be served by transferring this case to the United States District Court for the Eastern District of Missouri.

## III. CONCLUSION

For the foregoing reasons, GEMS' and Cass' motion to dismiss for improper venue is denied. In the alternative, we grant GEMS' and Cass' motion to transfer the action to the United States District Court for the Eastern District of Missouri. Consequently, we deny Defendants' motions to dismiss for lack of personal jurisdiction and GEMS' and Cass' motion to dismiss for failure to state a claim as moot. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated 5/15/03